IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAMELA SMITH, on her own behalf and on behalf of her daughter, under her pseudonym, JANE SMITH, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEALTH CARE SERVICE CORPORATION and MCG HEALTH, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) No. 19-cv-7162<br>)<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT

Plaintiff Pamela Smith, on her own behalf and on behalf of her daughter, proceeding under the pseudonym, "Jane Smith," and on behalf of all others similarly situated, complains as follows against Defendants Health Care Service Corporation ("HCSC") and MCG Health, LLC ("MCG," and, collectively with HCSC, "Defendants").

### INTRODUCTION

1.      This case arises from Defendant MCG's creation of, and Defendant HCSC's adoption and use of, clinical coverage criteria for determining when residential treatment of mental health conditions and/or substance use disorders is medically necessary and, thus, covered by the welfare benefit plans administered by HCSC. Although purporting to summarize accepted standards of medical practice, the criteria MCG created and HCSC used in administering benefit plans were much more restrictive than those generally accepted standards.

As such, they contradicted the plans' written terms of and violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq*.

## THE PARTIES

2. Plaintiff Pamela Smith is a participant in the Telephone and Data Systems, Inc. Health and Well-Being Plan (the "Smith Plan"), which is sponsored by Ms. Smith's employer. Plaintiff's daughter, referenced herein by the pseudonym "Jane Smith," is a beneficiary of the Smith Plan. Plaintiff Smith has been designated as her daughter's agent pursuant to a Power of Attorney.  Plaintiff Smith and her daughter, Jane, are residents of Wisconsin.

3. Defendant HCSC is a Mutual Legal Reserve Company that is headquartered in Chicago, Illinois. HCSC issues and administers health insurance plans in five states (Illinois, Texas, Oklahoma, New Mexico and Montana) as a licensee of the Blue Cross Blue Shield Association.

      (a) HCSC is the fourth-largest health insurance administrator in the country, with more than 16 million members. As of January 2019, it was responsible for processing mental health claims on behalf of more than 1.7 million members, including more than 727,000 members suffering from depression.

      (b) As the benefit administrator for the health plans at issue herein, HCSC is responsible for determining that the services for which coverage is requested are medically necessary before it approves coverage.

      (c) HCSC licensed MCG's Behavioral Health Care Guidelines (the "MCG Behavioral Health Guidelines"), including the MCG Guidelines for Residential Acute Behavioral Health Level of Care (the "MCG Acute RTC

Guidelines") described in this Complaint, and systematically used them to make the medical necessity determinations at issue in this case.

4. Defendant MCG is a part of the Hearst Health Network and is headquartered in Seattle, Washington.

(a) MCG assists health insurance companies and claims administrators like HCSC to make medical necessity decisions by creating and selling clinical coverage guidelines that are designed as criteria for determining which services are consistent with accepted medical practice and, thus, medically necessary as required for coverage under the applicable plans.

(b) According to MCG, eight of the largest U.S. health plans use the MCG Behavioral Health Guidelines, and its work impacts "over 208 million covered lives."

(c) MCG developed the defective MCG Acute RTC Guidelines at issue herein, promoted them as a proper basis for making medical necessity determinations with respect to residential treatment, and licensed them to HCSC, knowing that HCSC would rely upon the MCG Acute Residential Guidelines for that purpose.

**JURISDICTION AND VENUE**

5. Subject matter jurisdiction exists pursuant to 28 U.S.C. §1331.

6. Personal jurisdiction exists over HCSC and MCG, and this District is the proper venue, because HCSC is headquartered in this District and regularly communicates with insureds who reside in this District, and because MCG contracts with HCSC to use the MCG Behavioral Health Guidelines in this District.

## FACTUAL BACKGROUND

**I.     The Smith Plan**

7.      The Smith Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq*.

8.      The Smith Plan covers treatment for sickness, injury, mental illness, and substance use disorders.  Residential treatment is a covered benefit under the Smith Plan. The Plan does not limit residential treatment services to acute or emergency services or to short-term crisis intervention.

9.      HCSC is the benefit claims administrator for the Smith Plan.  As such, the plan grants discretion to HCSC to interpret plan terms, including limitations and exclusions, in determining whether services are covered and to cause any resulting benefit payments to be made by the Plan.

10.     Because HCSC exercises discretion with respect to the administration of the Smith Plan, and makes all final and binding benefit determinations under the plan, HCSC is a fiduciary within the meaning of ERISA, 29 U.S.C. §1104.

11.     Under the terms of the Smith Plan, one essential condition of coverage is that the services for which coverage is sought must be "medically necessary."  The Smith Plan defines "medically necessary" services to mean services that are, among other things, "appropriate and consistent with the diagnosis and which, in accordance with accepted medical standards in the state in which the service is rendered, could not have been omitted without adversely affecting the patient's condition or the quality of medical care rendered...."  Thus, under the terms of the Smith Plan, one essential condition of coverage is that the services for which coverage is sought must be consistent with accepted standards of medical practice.

4

12.     In addition, in making benefit determinations on behalf of all of its plans, including the Smith Plan, HCSC applies a uniform and internal definition of "medical necessity." HCSC's uniform definition also explicitly incorporates accepted standards of medical practice as a requirement for coverage.

13.     Therefore, one of the essential determinations HCSC makes when reviewing claims for coverage under the Smith Plan, and all other plans containing a medical necessity requirement, is whether the services for which coverage is sought are consistent with accepted standards of medical practice.

## II.     Accepted Standards of Medical Practice

14.     Accepted standards of medical practice, in the context of mental health and substance use disorder services, are the standards that have achieved widespread acceptance among behavioral health professionals. The accepted medical standards at issue in this case do not vary state-by-state.

15.     In the area of mental health and substance use disorder treatment, there is a continuum of intensity at which services are delivered. There are accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating patients' conditions. These accepted standards of medical practice are described in multiple sources, including peer-reviewed studies in academic journals, consensus guidelines from professional organizations, and guidelines and materials distributed by government agencies, including:  (a)  the American Association of Community Psychiatrists' ("AACP's") Level of Care Utilization System ("LOCUS"); (b) the American Society of Addiction Medicine ("ASAM") Criteria; (c) the Child and Adolescent Level of Care Utilization System ("CALOCUS") developed by AACP and the American Academy of Child and Adolescent

Psychiatry ("AACAP"), and the Child and Adolescent Service Intensity Instrument ("CASII"),

which was developed by AACAP in 2001 as a refinement of CALOCUS; (d) the Medicare

Benefit Policy Manual issued by the Centers for Medicare and Medicaid Services; (e) the APA

Practice Guidelines for the Treatment of Patients with Substance Use Disorders, Second Edition;

(f) the APA Practice Guidelines for the Treatment of Patients with Eating Disorders, Third

Edition; (g) the American Psychiatric Association's Practice Guidelines for the Treatment of

Patients with Major Depressive Disorder; and (h) AACAP's Principles of Care for Treatment of

Children and Adolescents with Mental Illnesses in Residential Treatment Centers.

16.     The accepted standards of medical practice for matching patients with the level of

care that is most appropriate and effective for treating patients' mental health conditions and

substance use disorders include the following:

(a)     **First**, many mental health and substance use disorders are long-

term and chronic. While current or acute symptoms are typically related to a

patient's chronic condition, it is generally accepted in the behavioral health

community that effective treatment of individuals with mental health or substance

use disorders is not limited to the alleviation of the current or acute symptoms.

Rather, effective treatment requires treatment of the chronic underlying condition

as well.

(b)     **Second**, many individuals with behavioral health diagnoses have

multiple, co-occurring disorders. Because co-occurring disorders can aggravate

each other, treating any of them effectively requires a comprehensive, coordinated

approach to all of the individual's conditions. Similarly, the presence of a co-

occurring medical condition is an aggravating factor that may necessitate a more intensive level of care for the patient to be effectively treated.

(c)      **Third**, in order to treat patients with mental health or substance use disorders effectively, it is important to "match" them to the appropriate level of care. The driving factors in determining the appropriate treatment level should be safety and effectiveness. Placement in a less restrictive environment is appropriate only if it is likely to be safe and *just as effective* as treatment at a higher level of care.

(d)      **Fourth**, when there is ambiguity as to the appropriate level of care, generally accepted standards call for erring on the side of caution by placing the patient in a higher level of care. Research has demonstrated that patients who receive treatment at a lower level of care than is clinically appropriate face worse outcomes than those who are treated at the appropriate level of care. On the other hand, there is no research that establishes that placement at a higher level of care than clinically indicated results in an increase in adverse outcomes.

(e)      **Fifth**, while effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

(f)      **Sixth**, the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment. Similarly, it is inconsistent with generally

accepted standards of medical practice to require discharge as soon as a patient becomes unwilling or unable to participate in treatment.

(g) **Seventh**, one of the primary differences between adults, on the one hand, and children and adolescents, on the other, is that children and adolescents are not fully "developed," in the psychiatric sense. The unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for mental health or substance use disorders. One of the ways practitioners should take into account the developmental level of a child or adolescent in making treatment decisions is by relaxing the threshold requirements for admission and continued service at a given level of care.

(h) **Eighth**, the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient. Except in acute situations that require hospitalization, where safety alone may necessitate the highest level of care, decisions about the level of care at which a patient should receive treatment should be made based upon a holistic, biopsychosocial assessment that involves consideration of multiple dimensions.

17. As a claims administrator and ERISA fiduciary, one of HCSC's fiduciary duties is to use due care in interpreting its plans, including when selecting the criteria it will use to make determinations about whether requested services are consistent with accepted standards and thus medically necessary.

18.     When HCSC decided to use the MCG Acute RTC Guidelines to make medical necessity decisions under the Plaintiff's and class members' plans, HCSC had access to the independent, publicly available sources referenced above, which describe the generally accepted standards of medical practice.  In the exercise of due care, HCSC thus knew, or should have known, what the accepted standards of medical practice actually are.

## III.     The MCG Behavioral Health Guidelines

19.     HCSC licenses the MCG Behavioral Health Guidelines, including the MCG Acute RTC Guidelines, and systematically applies them to determine whether services for which coverage is sought are medically necessary, including whether the services are consistent with generally accepted standards of medical practice.

20.     MCG develops its Behavioral Health Guidelines and licenses them to benefit administrators, including HCSC, with the express purpose and intention that the administrator will rely upon the Guidelines to make medical necessity determinations under welfare benefit plans, including plans governed by ERISA.  MCG knows or should know that HCSC uses the MCG Behavioral Health Guidelines, including the MCG Acute RTC Guidelines, to make benefit determinations, and knows or should know that the plans HCSC administers define medical necessity in relation to accepted standards of medicine.

21.     MCG explains its service as creating "care guidelines" to "provide fast access to evidence-based medicine's best practices and care plan tools across the continuum of treatment, providing clinical decision support and documentation which enables efficient transitions between care settings."  *See* https://www.mcg.com/about/company-overview/. MCG expressly intends for its Guidelines to increase "interrater reliability," or consistency of clinical

determinations among benefit adjudicators. *See* https://www.mcg.com/how-we-help/health-plans/interrater-reliability/.

22.     The MCG Acute RTC Guidelines include numerous footnote citations to peer-reviewed medical literature and physician specialty society recommendations that purportedly "support" the MCG criteria. In reality, year after year, the MCG Acute RTC Guidelines have been inconsistent with the primary sources on which they purport to rely and have distorted the accepted standards of medical practice for the treatment of behavioral health disorders, as explained below.

23.     In particular, MCG knowingly and intentionally created guidelines for evaluating residential treatment services that improperly heightened the relevance of acute behavioral health symptoms and conditions while minimizing the relevance of non-acute behavioral health symptoms and conditions -- that is, chronic mental health conditions or substance use disorders that are persistent and/or pervasive and could not necessarily be effectively treated by short-term clinical interventions.

## IV.     The MCG Acute RTC Guidelines are Inconsistent with Accepted Standards of Medical Practice

24.     As of April 2018, the MCG Guideline used by HCSC that was applicable to residential treatment for adults with behavioral health disorders was entitled "Residential ***Acute*** Behavioral Health Level of Care, Adult (20th Edition)" ("MCG Acute RTC Guidelines"). Thus, when HCSC licensed the MCG Behavioral Health Guidelines, which included the MCG Acute RTC Guidelines, it knew or should have known that its use of the MCG Acute RTC Guideline criteria would restrict the scope of available coverage for residential treatment of behavioral health conditions.

25.    MCG has from time to time issued revised versions of its Behavioral Health Guidelines, including the MCG Acute RTC Guidelines.  The current version of the MCG Behavioral Health Guidelines is the 23rd Edition.  At all times relevant to this Complaint, the applicable version of the MCG Acute RTC Guidelines was (and still is) inconsistent with accepted standards of medical practice, as described below.

26.    For example, the MCG Acute RTC Guidelines specify that, to be medically necessary upon admission, residential services must satisfy a number of threshold conditions:

(a)    First, "[a]round-the-clock behavioral care is necessary" because of: (1) "danger to self" due to auditory hallucinations or persistent thoughts of suicide or serious harm to self that cannot be adequately monitored; (2) "danger to others" due to auditory hallucinations or persistent thoughts of homicide or serious harm to self that cannot be adequately monitored; or (3) a behavioral health disorder characterized by daily occurrence of "moderately severe psychiatric conditions requiring treatment," such as hallucinations, delusions, disorganized speech, and so on, **and** "serious dysfunction in daily living," such as impulsive or abusive behaviors, avoidance of almost all social interaction, failure to achieve self-care; inability to fulfill adult obligations, like work or parenting.

(b)    Second, **all** of the following must be true (in addition to other requirements): (1) treatment at a lower level of care is not "feasible"; (2) *"[v]ery short-term* crisis intervention and resource planning for continued treatment at a nonresidential level is unavailable or inappropriate"; (3) "[p]atient is *willing* to participate in treatment within highly structured setting voluntarily"; *and* (4)

11

"biopsychosocial stressors have been assessed and are absent or *manageable* at

proposed level of care" (emphasis added).

27.     These requirements are much more restrictive than accepted standards. For

example, contrary to accepted standards of medical practice, the MCG Acute RTC Guidelines

condition admission to residential treatment on the presence of suicide/homicide factors that

cannot be "monitored adequately" at lower levels of care, rather than on the presence of

suicide/homicide factors that cannot be as *effectively treated* at lower levels of care.

28.     The MCG Acute RTC Guidelines also provide that persistent thoughts of suicide

or homicide coupled with "ready access to lethal means" may be a basis for residential

admission, while accepted standards indicate that those factors are far more consistent with the

degree of lethality warranting hospitalization.  Those criteria thus unjustifiably raise the acuity

bar for admission to the residential level of care, and are inconsistent with the primary sources

MCG cites in support of its Acute RTC Guideline criteria.

29.     The MCG Acute RTC Guidelines also improperly limit the behavioral health

disorders that may warrant residential treatment to those involving "psychiatric symptoms which

are acute," including obsessions and compulsions, "or represent a worsening over baseline,"

instead of acknowledging the accepted standard that conditions and symptoms may be chronic

but still significantly impairing, such that residential treatment may be the most appropriate level

of care even in the absence of acute symptoms.

30.     Even if patients meet the unjustifiably stringent acuity thresholds described

above, the MCG Acute RTC Guidelines provide that residential treatment is not medically

necessary if treatment at a lower level of care is "feasible." As described above, however, under

accepted standards of medical practice, treatment at a less intensive level of care must be "as effective" as the more intensive level of care -- not merely "feasible."

31.     The MCG Acute RTC Guidelines' stringent criteria also require that "very short-term crisis intervention" at a non-residential level be unavailable or inappropriate -- thus indicating that care at a residential level is expected to be for "very short-term crisis intervention." This requirement is inconsistent with accepted standards of medical practice, which do not restrict residential treatment to "crisis intervention" and which do not limit residential treatment to artificially predetermined durations, let alone to "very short-term" stays.

32.     The MCG Acute RTC Guidelines also improperly limit the scope and duration of residential treatment by providing that biopsychosocial stressors -- which, according to MCG, include comorbid conditions -- need only be "manageable" at the proposed level of care, thus setting the expectation that "management" of comorbid conditions is all that is required. Accepted standards of medical practice, however, recognize that biopsychosocial stressors, if present, must be "effectively treated" -- not merely "managed."

33.     Furthermore, to meet medical necessity under the MCG Acute RTC Guidelines, patients must be "willing" to participate in treatment in a highly structured setting "voluntarily." This criterion, too, is inconsistent with accepted standards of medical practice, which recognize that a lack of motivation for treatment may necessitate *higher* levels of care and that treatment might not be sought at one's own initiative (*e.g.*, a court, conservator, or guardian may demand or require it).

34.     At the same time as the MCG Acute RTC Guidelines unjustifiably restrict admission to residential treatment, they generously allow for discontinuation of such care as soon as risk of harm, functional impairments, and comorbidities can be "managed" -- rather than

"effectively treated" -- at lower levels. As discussed above, under accepted standards of medical practice, treatment at a less intensive level of care is warranted only if it is just as effective as the more intensive level of care. Superficially "managing" a patient's condition is not sufficient.

35.     In sum, on their face, the MCG Acute RTC Guidelines provide that residential behavioral health treatment is only medically necessary for crisis stabilization or other circumstances in which a patient is suffering from acute symptoms. As such, the MCG Acute RTC Guidelines are much more restrictive than the accepted standards of medical practice, which recognize that persistent and/or pervasive behavioral health disorders cannot necessarily be as effectively treated on a short-term and/or outpatient basis as they could be in residential care.

36.     MCG's decision to develop guidelines *only* for "acute" residential care, and not for treatment of chronic conditions at the residential level of care, was knowing and intentional. As MCG admitted in a 2017 white paper, MCG views intermediate levels of care (including residential treatment) for behavioral health conditions very differently from intermediate levels of care for medical/surgical conditions:

> While inpatient and outpatient levels of care are common to both [mental health and substance use disorder ("MHSUD") benefits] and physical health conditions, there is a divergence in how intermediate levels of care (*e.g.*, services less intensive than would be available in an inpatient hospital setting, but more expansive than care that could be provided in most outpatient clinics) are managed.
>
> ...Intermediate levels of care for *medical/surgical conditions are designed to improve functional status among people with impairments that, while potentially significant, generally are not acute, and are not offered as alternatives to inpatient admission.* As an example, the presence of an acute pulmonary infection, such as pneumonia, likely would lead to a denial of admission to a pulmonary rehabilitation program [an intermediate level of care].
>
> In contrast*, intermediate levels of care for MHSUDs are designed to support acute management of patients with MHSUDs. They often service as alternative*

> *to inpatient care, and are intended to have the ability address acute symptoms or provide crisis stabilization*... (emphasis added).

"Mental Health Parity: Where Have We Come From? Where Are We Now?," available at https://www.ahip.org/wp-content/uploads/2017/06/MCG-White-Paper-Mental-Health-Parity.pdf.

37.     As the MCG white paper demonstrates, MCG takes the position that while intermediate care for medical/surgical services is designed to address sub-acute conditions in order to improve functional status, intermediate care for behavioral health services is only available "to support acute management" and to "address acute symptoms or provide crisis stabilization."

38.     MCG's website also reflects its view that residential treatment is only available for "acute" behavioral health conditions. MCG offers a set of "Level of Care Comparison Charts" that "allow[] a side by side comparison of behavioral health level of care criteria" to "facilitate placement decisions for behavioral health levels of care." As MCG's own description makes clear, MCG recognizes only "5 levels of care" for behavioral health treatment: "inpatient, *acute* residential, partial hospital, intensive outpatient, and *acute* outpatient care." *See* https://www.mcg.com/care-guidelines/behavioral-healthcare/ (emphasis added).

39.     MCG deliberately developed, promoted, and sold clinical coverage criteria that provide that residential treatment of behavioral health conditions is only "medically necessary" when the patient's symptoms and conditions are acute. It did so knowing that its benefit administrator customers, like HCSC, would use the criteria to make medical necessity determinations.  MCG thus knew, or should have known, that its MCG Acute RTC Guidelines would have the effect of restricting the scope of coverage available under the benefit plans administered by MCG's customers, including HCSC, and severely limiting the availability of intermediate inpatient treatment for behavioral health conditions to HCSC's insureds.

**V.    Financial Considerations Infected MCG's Development of its Behavioral Health Guidelines and HCSC's Decision to Adopt and Use Those Guidelines to Make Medical Necessity Determinations.**

40.     Both Defendants have tremendous financial incentives to artificially suppress behavioral health costs by restricting coverage for treatment of chronic behavioral health conditions.

41.     HCSC makes money by charging fees for its services, including behavioral health claims administration.

(a)     For fully-insured plans, HCSC charges a premium, from which all approved benefits are paid.  HCSC therefore bears the risk that benefit reimbursements will exceed the fixed premiums and/or any per-member, per-month rates that HCSC allocates for behavioral health expenditures.

(b)     For self-funded plans, HCSC is paid an administrative fee and the employer, as the plan sponsor, pays the medical expenses that HCSC approves. HCSC has an incentive to reduce such medical expenses in order to retain business and sell its services as a cost-effective claims administrator.

42.     MCG makes money by selling its Guidelines, including the MCG Acute RTC Guidelines, to insurers and claims administrators like HCSC. MCG markets its Behavioral Health Guidelines as a cost-savings device, knowing that its acuity-driven guidelines will be used to preclude coverage for chronic conditions, in conflict with generally accepted standards of medical practice.

43.     Residential treatment, though widely recognized as a critical component in the behavioral health continuum of care, can be quite expensive. Avoiding benefit expense associated with providing coverage for residential treatment, therefore, directly benefitted

HCSC's bottom line. MCG benefitted by selling its restrictive criteria to administrators, like HCSC, who wanted to reduce expenditures on this type of treatment.

44.     On information and belief, these financial incentives have infected the MCG Behavioral Health Guidelines, including the Acute RTC Guidelines at issue herein, since these Guidelines are the primary clinical tool Defendants use to reduce medical expense by rationing access to behavioral healthcare, including expensive residential treatment.

## VI.     HCSC Used the Defective MCG Acute RTC Guidelines to Deny Benefits to Plaintiff in Contravention of Her Plan's Written Terms

45.     As HCSC's denial letters reflect, HCSC denied coverage for Jane Smith's residential treatment based on the MCG Acute RTC Guidelines -- *i.e.*, acuity-driven, treatment-undermining criteria that are inconsistent with the "accepted standards of medical practice" that she was promised in her Plan.

46.     Jane Smith suffers from, among other conditions, major depression, substance use, and borderline personality disorder. On April 4, 2018, Jane was admitted for residential treatment of her mental health conditions at Rogers Memorial Hospital ("Rogers"), an in-network facility. She remained in residential treatment until May 16, 2018.  Through Rogers, Plaintiff timely requested coverage for Jane's residential treatment.

47.     By letter dated April 6, 2018, HCSC denied Plaintiff's request for coverage, on the ground that residential treatment was not medically necessary. HCSC based its determination on the MCG Acute RTC Guidelines. Rogers submitted an urgent appeal of the denial the next day.

48.     In a letter dated April 8, 2018, HCSC denied the urgent appeal, citing the MCG Acute RTC Guidelines, again finding that the treatment was not medically necessary.

49.     On August 1, 2018, Plaintiff submitted a post-service appeal seeking coverage for Jane's residential treatment. On August 10, 2018, HCSC approved six days of coverage, but denied coverage for Jane's residential treatment from April 10, 2018 to May 16, 2018. Again, HCSC's denial letter cited the MCG Acute RTC Guidelines as the basis for its determination.

50.     The Smith Plan provides that, after internal appeals are completed, members may also seek external review of a denial by a so-called Independent Review Organization ("IRO"). In fact, the IROs are selected by, contracted with, and paid by HCSC.

51.     Plaintiff sought external review of HCSC's denial of her requests for coverage of Jane's residential treatment. HCSC selected an IRO company called Dane Street to perform the review. On January 14, 2019, Dane Street upheld HCSC's denial of coverage for Jane's residential treatment from April 10, 2018 through May 16, 2018. In reaching this decision, the IRO stated:

> ...*MCG 20th Edition (p. 1-2) Residential Acute Behavioral Health Level of Care, Adult ORG: B-901-RES (BHG) coverage criteria have not been met*. Therefore the medical records do not establish that the services performed were medically necessary according to generally accepted standards of care. (Emphasis added.)

52.     Furthermore, in upholding HCSC's denial of coverage, Dane Street (the IRO company HCSC selected) stated that "[f]rom the clinical evidence, the member could be safely treated in a less restrictive setting such as mental health intensive outpatient." In other words, the IRO company found (based on the restrictive MCG Behavioral Health Guidelines) that treatment at the intensive outpatient level of care *was* medically necessary.

53.     Treatment in an intensive outpatient program ("IOP") typically consists of about 10-12 hours of group and individual therapy each week on an outpatient basis. Treatment in a residential treatment facility includes at least as many hours of group and individual therapy as

18

IOP, but includes additional services in a 24-hour setting. Intensive outpatient treatment services are thus fully subsumed within the residential treatment level of care.

54. Nevertheless, despite its IRO's finding that Jane's treatment did satisfy the medical necessity requirement for intensive outpatient services, HCSC did not reimburse Jane's claims for coverage at the rate for intensive outpatient treatment. Instead, HCSC denied coverage in its entirety from April 11, 2018 forward.

55. In so doing, HCSC generated an artificial windfall for its client, Telephone and Data Systemic, Inc., the sponsor of Plaintiff's self-funded health plan, while causing Plaintiff to incur significant unreimbursed expenses.

## CLASS ACTION ALLEGATIONS

56. Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

57. The policies and practices that HCSC followed with respect to the benefit claims filed by Plaintiff are the same as those that have been applied by HCSC to other similarly-situated insureds seeking coverage under their health plans for residential behavioral health treatment, including HCSC's use of the MCG Acute RTC Guidelines or other MCG Behavioral Health Guidelines that contained the same restrictive medical necessity criteria.

58. As such, pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings each of her claims, set forth in the counts below, on behalf of the following class ("Class") of similarly-situated individuals:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a behavioral health disorder was denied by HCSC, in whole or in part, within the applicable statute of limitations, based on the MCG Acute RTC Guidelines or other MCG Behavioral Health Guidelines that contain the same coverage criteria as the MCG Acute RTC Guidelines.

19

59. The members of the Class can be objectively ascertained through the use of information contained in HCSC's files because HCSC knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

60. Upon information and belief, there are so many persons within the putative class that joinder is impracticable. While Plaintiff does not have access to the identity of the putative class members, such information is within the possession and control of Defendants.

61. Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of the Class. Such common questions of law and fact include, but are not limited to: (a) whether the MCG Acute RTC Guidelines are consistent with generally accepted standards of medical practice; (b) whether HCSC breached its fiduciary duties when it adopted and licensed the MCG Behavioral Health Guidelines; (c) whether HCSC breached its fiduciary duties when it used the MCG Acute RTC Guidelines to deny requests for benefits for residential treatment; (d) whether HCSC's use of the MCG Acute RTC Guidelines to deny requests for benefits for residential treatment of behavioral health disorders violated the terms of the class members' plans; (e) whether MCG was a knowing participant in HCSC's beaches of fiduciary duty and violations of ERISA; and (f) what remedies are available to the Class.

62. Certification is desirable and proper because the Plaintiff's claims are typical of the claims of the members of the Class Plaintiff seeks to represent.

63. Certification is also desirable and proper because the Plaintiff will fairly and adequately protect the interests of the Class she seeks to represent. There are no conflicts between the interests of the Plaintiff and those of other members of the Class, and the Plaintiff is

cognizant of her duties and responsibilities to the entire Class. Plaintiff's attorneys are qualified, experienced and able to conduct the proposed class action litigation.

64. It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

65. The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the Class through numerous separate actions.

## COUNT I

### Claim for Breach of Fiduciary Duty
### Against HCSC

66. Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

67. Plaintiff brings this count, on her own behalf and on behalf of the Class, pursuant to 29 U.S.C. §1132(a)(1)(B).

68. As explained above, HCSC is responsible for interpreting the plans it administers, determining whether services are covered, and making final and binding decisions about whether to approve benefits payments requested by plan members. As such, HCSC has and exercises discretionary authority with respect to the administration of the plans and the payment of plan benefits. HCSC is therefore an ERISA fiduciary as defined by 29 U.S.C. §§1002(21)(A) and 1104(a).

69. As an ERISA fiduciary, and pursuant to 29 U.S.C. §1104(a), Defendant HCSC has a duty of loyalty to plan participants and beneficiaries which requires it to discharge its

duties "solely in the interests of the participants and beneficiaries" of the plans it administers and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plan. HCSC also owed plan participants and beneficiaries a duty of care, which requires it to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA.

70.     Defendant HCSC violated these duties by adopting and/or using the MCG Acute RTC Guidelines discussed herein to deny coverage to Plaintiff and the putative Class. Despite the fact that the health insurance plans that insure Plaintiff and the Class members provide for decisions about the medical necessity of residential behavioral health treatment to be made consistent with generally accepted standards of medical practice, and the fact that generally accepted standards of medical practice are widely available and well-known to HCSC, HCSC in fact selected, adopted and used clinical coverage criteria that are far more restrictive than generally accepted standards of medical practice. In doing so, HCSC did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." It did not use the "care, skill, prudence, and diligence" ERISA demands of fiduciaries. It did not act in accordance with the terms of the Plaintiff's or the Class members' plans.

71.     Instead, HCSC elevated its own interests above the interests of the plan participants and beneficiaries. By adopting improperly restrictive guidelines, HCSC artificially decreased the number and value of covered benefit claims, thereby benefiting itself at the expense of its insureds.

72.     Plaintiff and the members of the Class have been harmed by Defendant HCSC's breaches of fiduciary duty because their requests for benefits were subjected to Defendants'

restrictive clinical coverage guidelines, making it less likely that HCSC would approve coverage. HCSC thereby improperly restricted the scope of coverage otherwise available under the Plaintiff's and class members' plans and severely limited the availability of residential treatment services available to Plaintiff and the class members.

73.     Plaintiff and the members of the Class seek the relief identified below to remedy this claim.

## COUNT II

**Violation of Plan Terms**
**Against HCSC**

74.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

75.     Plaintiff brings this count, on her own behalf and on behalf of the Class, pursuant to 29 U.S.C. §1132(a)(1)(B).

76.     HCSC denied the requests for coverage of residential treatment services submitted by Plaintiff and other members the Class, in violation of the terms of the applicable plans. HCSC denied benefits to Plaintiff's daughter and the class members, at least in part, based on restrictive clinical coverage guidelines it adopted in violation of its fiduciary duties. HCSC also denied the request for benefits, at least in part, based on its systematic practice of applying clinical coverage guidelines that are more restrictive than generally accepted standards of medical practice, as set forth above.

77.     Plaintiff and the members of the Class were harmed by HCSC's improper benefit denials because HCSC denied their requests for benefits using clinical coverage criteria that were inconsistent with the applicable plan terms and thus violated ERISA.

78.     Plaintiff and the members of the Class seek the relief identified below to remedy this claim.

## COUNT III

**Claim for Injunctive Relief**
**Against HCSC**

79.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

80.     Plaintiff brings this count, on her own behalf and on behalf of the Class, pursuant to 29 U.S.C. §1132(a)(3)(A), only to the extent that the Court finds that the injunctive relief available pursuant to 29 U.S.C. §1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II.

81.     Plaintiff and the Class have been harmed, and are likely to be harmed in the future, by Defendant HCSC's breaches of fiduciary duty and/or violations of ERISA described above.

82.     In order to prevent HCSC's ongoing violations of ERISA and the applicable plans, and the harm those violations cause, Plaintiff and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. §1132(a)(3)(A).

## COUNT IV

**Claim for Other Appropriate Equitable Relief**
**Against HCSC**

83.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

84.     Plaintiff brings this count, on her own behalf and on behalf of the Class, pursuant to 29 U.S.C. §1132(a)(3)(B), only to the extent that the Court finds that the equitable relief

available pursuant to 29 U.S.C. §1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II.

85.     Plaintiff and the Class have been harmed, and are likely to be harmed in the future, by Defendant HCSC's breaches of fiduciary duty and/or violations of ERISA described above.

86.     In order to completely and adequately remedy these harms, Plaintiff and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. §1132(a)(3)(B).

## COUNT V

### Claim Against MCG for Knowing Participation
### in HCSC's Violations of ERISA

87.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

88.     Plaintiff brings this count, on her own behalf and on behalf of the Class, pursuant to 29 U.S.C. §1132(a)(3)(A) and (B), against MCG as a knowing participant in the ERISA violations and breaches of fiduciary duty by Defendant HCSC alleged in Counts I-IV above.

89.      MCG licensed its MCG Behavioral Health Guidelines, including the MCG Acute RTC Guidelines, to HCSC for use in making medical necessity coverage determinations with respect to ERISA plans. MCG knew that HCSC was purchasing the MCG Behavioral Health Guidelines for this purpose and that is why MCG created and sold such Guidelines.

90.     In developing and selling the MCG Acute RTC Guidelines, MCG knew that the Guidelines' criteria for determining the medical necessity of residential treatment for chronic behavioral health conditions were not consistent with generally accepted standards of medical practice.

91.     Moreover, in developing and selling its MCG Acute RTC Guidelines, MCG knew that the use of its criteria would necessarily restrict or limit coverage for the residential treatment of behavioral health disorders under plans that required services to be consistent with generally accepted standards to be considered medically necessary.

92.     As set forth above, Plaintiff and the members of the Class have been harmed by the ERISA violations detailed herein in which MCG knowingly participated.

93.     Plaintiff and the members of the Class seek the relief identified below to remedy this claim.

### REQUESTED RELIEF

**WHEREFORE**, Plaintiff demands judgment in her favor against Defendants as follows:

A.      Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

B.      Appointing the Plaintiff as Class Representative for the Class;

C.      Designating Zuckerman Spaeder LLP, Psych-Appeal, Inc., and Miner, Barnhill & Galland, P.C. as Class Counsel;

D.      Declaring that the MCG Acute RTC Guidelines complained of herein are inconsistent with generally accepted standards of medical practice;

E.      Issuing a permanent injunction ordering HCSC to stop using the MCG Acute RTC Guidelines complained of herein, and instead to adopt or develop and use clinical coverage guidelines that are consistent with generally accepted standards of medical practice;

F.      Issuing a permanent injunction ordering MCG to stop licensing the MCG Acute RTC Guidelines complained of herein for use in determining the medical necessity of residential treatment of behavioral health conditions;

G.      Ordering HCSC to reprocess the claims for residential behavioral health treatment

that it previously denied (in whole or in part) under the MCG Acute RTC Guidelines or any

other MCG Guidelines containing the same restrictive criteria, pursuant to new guidelines that

are consistent with generally accepted standards of medical practice;

H.      Awarding other appropriate equitable relief, including but not necessarily limited

to additional declaratory and injunctive relief;

I.      Awarding Plaintiff's disbursements and expenses for this action, including

reasonable counsel and expert fees, in amounts to be determined by the Court, pursuant to 29

U.S.C. §1132(g); and

J.      Granting such other and further relief as is just and proper.

Dated:  October 31, 2019                    Respectfully submitted,


                                            /s/ George F. Galland, Jr.
                                            George F. Galland, Jr.
                                            One of the Attorneys for Plaintiff


George F. Galland, Jr.
ggalland@lawmbg.com
David Baltmanis
dbaltmanis@lawmbg.com
MINER, BARNHILL & GALLAND, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
Tel: (312) 751-1170

D. Brian Hufford (subject to *pro hac vice* admission)
dbhufford@zuckerman.com
Jason S. Cowart (subject to *pro hac vice* admission)
jcowart@zuckerman.com
ZUCKERMAN SPAEDER LLP
485 Madison Ave., 10th Floor
New York, NY 10022
Tel: (212) 704-9600

Caroline E. Reynolds (subject to *pro hac vice* admission)
creynolds@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M St., N.W., Ste. 1000
Washington, DC 20036
Tel: (202) 778-1800


Meiram Bendat (subject to *pro hac vice* admission)
mbendat@psych-appeal.com
PSYCH-APPEAL, INC.
8560 W. Sunset Blvd., Ste. 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101

Attorneys for Plaintiff